OPINION AND JUDGMENT ENTRY
This is an appeal from the Lucas County Court of Common Pleas which, following a jury trial, found defendant-appellant, Elzie Walker, guilty of ten counts of aggravated robbery, one count of kidnapping and seven firearm specifications. Appellant sets forth the following assignment of error:
 "The Defendant-Appellant was Denied the Effective Assistance of Counsel at Trial, in Violation of his Sixth Amendment Rights."
The following facts are relevant to this appeal. On July 25, 1997, appellant was indicted on thirteen counts of aggravated robbery, in violation of R.C. 2911.01(A)(1). Each count was accompanied by a firearm specification, in violation of R.C. 2941.145. Appellant was also charged with one count of kidnapping, in violation of R.C. 2905.01(A)(2). Appellant was arraigned on July 29, 1997. He entered pleas of not guilty as to all counts and specifications.
A hearing on a motion to suppress was held on September 30, 1997. The motion was denied and the jury trial commenced immediately thereafter. At trial, the following relevant evidence was presented.
The parties stipulated that appellant is five feet six inches tall.
Ricardo Garcia testified that on the evening of January 18, 1997, he was working at the Spigot Bar located on Western Avenue in Toledo, Lucas County, Ohio. Garcia stated that at approximately 9:00 p.m. two men walked into the bar and asked for a bag of Doritos. Garcia stated that he told the men that they did not have Doritos and the men left. A couple of minutes later the men returned and one approached the bar asking for a bag of barbecued pork rinds. Garcia testified that he turned back around with the chips and one of the men had a gun pointed at his face. Garcia identified this man as about five feet eleven or six feet tall with some facial hair. He could not identify the other man. Cindy Farnham testified that she was a patron of the Spigot Bar on January 18, 1997, but had consumed no alcoholic beverages. She stated that the gunman was a black man approximately five feet ten inches tall, with a round face.
Jerry Dalton next testified that his bar, Jerry's Pub, located on Ash Street in Toledo, Lucas County, Ohio, was robbed by three armed men on January 27, 1997. He could not identify the men. Linda Anderson, a barmaid at Jerry's Pub, testified that the men were all tall and that they had ski masks and gloves on, but looked black. Robert Dalton testified that the description he gave to the police was that the perpetrators were tall and black. Fannie Dalton next testified that she was not able to give a description of the individuals because their faces were covered.
Connie Haines testified that on January 28, 1997, she was working as a cashier at Erie Foods, when two men wearing ski masks entered the store. Haines stated that the tall individual robbed her while a shorter man, about "five-five" or "five-six" and one hundred thirty-five pounds, robbed the other cashier. During cross examination, the police incident report was admitted which described the individuals as six feet tall and six feet one inches tall. Haines did not remember giving the information. On redirect, Haines was referred to the supplemental report which described the suspects as twenty to twenty-five years old and five feet seven and five feet nine. Haines remembered giving this information because she was trying to judge the suspects' heights in relation to her own. Terry Deleon was the other cashier working at Erie Foods on the date of the robbery. She testified that the individual who robbed her was about "five foot five" or "five foot six" because she had to look up to him a "little bit." She testified that she is five feet two inches tall.
Keith Lesage testified that he was a patron at TJ's Lounge, in Toledo, Ohio, in the early morning of January 28, 1997. He stated that three men entered the bar. One had the barmaid empty the cash register, one near him jumped up on the bar with a gun and told everyone to empty their pockets, and one went out of his sight back by the pool tables. Lesage testified that the individual closest to him was approximately five feet eight or under and that the man behind the bar was around five feet eight or five feet nine. Christopher Poole also testified that he was at TJ's during the robbery but that he was back by the pool tables. He stated that the individual who robbed him was an inch or two taller than he is. Poole indicated that he is five feet eight inches tall. Poole testified that he did not have an opportunity to observe the other robbers.
Calvin Snow, a co-defendant, testified on behalf of the state pursuant to a plea agreement. Snow testified that he met appellant in 1991. Snow testified that appellant was with him and directly involved in the robberies of the Spigot Bar, Jerry's Pub, TJ's Lounge, Erie Foods, Kentucky Fried Chicken, Marco's Pizza on Reynolds Road, Nationwide Furniture, Rudy's Hot Dog on Monroe Street, Marco's Pizza on Monroe Street, Kroger on West Central Avenue and Los Amigos Restaurant.
Snow further testified that he decided to cooperate with authorities after appellant refused to help him get out on bond. Snow testified that before entering into the plea agreement he was facing eleven counts of kidnapping and thirteen counts of aggravated robbery with gun specifications.
Kristina Blakenship next testified that in February 1997, she was working at Blockbuster Video, on Monroe Street, when "one short guy and one tall" entered with a gun and proceeded to rob the store. Blakenship testified that the men wore ski masks.
Deborah Tolliver testified that she was working at the Kentucky Fried Chicken on Stickney Avenue on February 1, 1997. On that date, Tolliver stated that two masked and armed men robbed the restaurant. She testified that the men were black and that one was tall and one was short.
Marc Meyers testified that on February 8, 1997, he was working at the Marco's Pizza, on Reynolds Road, when it was robbed. Meyers described the two masked and armed robbers as being a little bit shorter than he is. He stated that he is six feet four inches tall. He further stated the there was about a five or six inch height difference between the two men. James O'Brien was also at the Marco's Pizza during the robbery. O'Brien testified that the robbers were black men, about six feet tall.
Debbie Harris testified that she was working at the Kentucky Fried Chicken, on Fearing Boulevard, on February 7, 1997. On that date, two men entered, jumped over the counter, and robbed the restaurant at gunpoint. Harris testified that the men were about six feet tall and black; however, one of the men had a lighter complexion than the other.
Socorro Sevilla was working at the Marco's Pizza on Main Street, when the store was robbed on February 17, 1997.
Sevilla testified that she was taking out the trash and two men came running up to her. She stated that there was a taller man and a shorter man who was about five feet six. The men forced her to let them in the back door and they proceeded to rob the store at gunpoint. Jennifer Luda, also at Marco's on the night of the robbery, testified that one of the men was six feet tall while the other man was about her height. She stated that her height is five feet five.
Harry Bowlen, an employee of Nationwide Mattress and Furniture on Dorr Street, testified that on February 21, 1997, three masked men entered the store with guns. Bowlen stated that they were tall. Robert Brooks was also working at Nationwide on the date of the robbery. Brooks testified that the men ranged in height from about five feet five to five feet eight.
Kathleen Evans next testified that on April 18, 1997, at approximately 10:45 p.m., she was ending her shift at Los Amigos Restaurant on Stickney Avenue. A man walked in wearing a hooded sweatshirt and had a revolver. Evans testified that he robbed her of her tip money. She further stated that the gunman was about six feet tall, maybe less. She was unsure because she was seated during the robbery.
Freddie Loyd, a co-defendant, testified that he and appellant are cousins. He stated that on February 21, 1997, he waited in the car while appellant, Cobbler and Snow robbed Nationwide Mattress and Furniture. He testified that he did not see appellant with a gun on that day.
Harry Proestos, General Manager of Rudy's Hot Dog, next testified that he was working at the Rudy's on Monroe Street on February 28, 1997, when he was approached by two masked men. The men were both armed. He stated that there was a third man but that he did not observe him. The men he saw were taller than he. Proestos testified that he is five feet five.
Co-defendant Lawrence Payne, testified that in exchange for his testimony, the charges against him were reduced from three counts of aggravated robbery and one count of kidnapping, to one court of aggravated robbery without the firearm specification and one count of kidnapping.
Payne testified that he is appellant's first cousin and has known him all his life. Payne implicated appellant in the robbery of TJ's Lounge. Payne also described the guns that were used and the clothing, including masks and gloves. Payne denied any involvement in the Erie Foods or Los Amigos robberies.
Antonio Cobbler, a co-defendant of appellant, testified that he and Walker, and sometimes Snow and/or Payne were involved in several robberies including Jerry's Pub, TJ's Lounge, Erie Foods, Kentucky Fried Chicken on Stickney Avenue, Blockbuster Video on Monroe Street, Kentucky Fried Chicken on Fearing Street, Marco's Pizza on Reynolds Road, Marco's Pizza on Main Street, Nationwide Warehouse on Dorr Street, and Rudy's Hot Dogs on Monroe Street.
Cobbler testified that after he and Snow robbed the Kroger store on West Central, he was driving to his apartment when he noticed a police cruiser behind him. They arrived at the complex and jumped out of the car. Snow ran off and Cobbler ran up to his apartment. Approximately one hour later, the police arrived at his door.
Cobbler eventually cooperated with police. Cobbler testified that he was offered a plea agreement which would allow him to plead guilty to two counts of aggravated robbery and two counts of kidnapping.
Shamena Sturdivant, Cobbler's girlfriend, testified that she was at the apartment when Cobbler was arrested. She stated that she originally lied to police but soon cooperated. Sturdivant further testified that appellant called her after Cobbler had been arrested in order to find out if he was cooperating with police.
Three law enforcement officers testified regarding the arrest of Cobbler and the investigation of the robberies. State Highway Patrol Trooper Michael Rodriguez, testified that in the early morning of March 29, 1997, he heard a report on his police radio of the Kroger robbery. The broadcast stated that the vehicle involved was a white Chrysler New Yorker. He spotted a car matching the description and followed it into an apartment complex. The occupants ran from him and he waited for back up. He observed the condition of the vehicle which included a handgun.
Toledo Police Officer Jeffrey Scott also observed the condition of the car and searched the apartment. In the apartment, he uncovered a videotape which later was identified as the surveillance tape from Rudy's Hot Dogs which included footage of the robbery. Scott was also cross-examined about the procedure for taking crime reports.
Toledo Police Detective Stephen Burke confirmed that all of the robberies occurred in Toledo, Lucas County, Ohio. William Goetz, with the Toledo Police scientific investigation unit, testified that they were unable to uncover appellant's fingerprints in the Chrysler New Yorker. He also inventoried the items in the car including the revolver, a box of .45 caliber cartridges, Rudy's Hot Dog gift certificates and a gold necklace, among other items.
During the appellant's case, his father, Elzie Fitch, and his mother, Marilyn Fitch, testified that their son was in New Orleans, Louisiana, during the period of the robberies.
Arvana Love, appellant's girlfriend, also testified that appellant was in New Orleans during the period of the robberies. She testified that in February 1997, she and a friend bought new tires for appellant's car and used his name. She also stated that she pretended to be appellant and got the auto title in his name, but that she did not get a driver's license in his name.
Appellant testified that he was in New Orleans during the time period of the robberies, staying with relatives and looking for work. He denied buying new tires and buying a Chevrolet from TNT Motors on February 20, 1997, returning it and buying a Lincoln on February 22, 1997.
During the state's rebuttal, Sam Foust, an employee of TNT Auto Sales, testified that appellant purchased a Chevrolet on
February 20, 1997, and a Lincoln on February 22, 1997, and that the paperwork was filled out in Foust's presence. A Capital Tire representative also testified that on February 22, 1997, a man who identified himself as Elzie Walker purchased a $1,900 set of tires and wheels. The individual paid in cash. Freddie Loyd testified that he was with appellant when he purchased the vehicles and the wheels and tires.
On October 6, 1997, the jury returned verdicts of guilty as to: Count One, the Spigot Bar; Count Three, Erie Foods; Court Four, TJ's Lounge; Count Five, Kentucky Fried Chicken, Stickney Avenue; Count Six, Blockbuster Video; Count Seven, Kentucky Fried Chicken, Fearing Boulevard; Count Eight, Marco's Pizza, Reynolds Road; Count Nine, Marco's Pizza, Main Street; Count Ten, Nationwide Mattress Company; and Count Fifteen, Rudy's Hot Dog, Monroe Street. The jury also found appellant guilty of Count Sixteen, kidnapping involving the Rudy's Hot Dog robbery.
Appellant was found not guilty as to Count Two, Jerry's Pub and Count Eighteen, Los Amigos Restaurant. Appellant was found not guilty of firearm specifications as to Counts Three, Eight and Ten.[1]
On October 7, 1997, appellant was sentenced to a total term of imprisonment of fifty-six years. Appellant then timely filed this appeal.
In his sole assignment of error, appellant asserts that he was denied effective assistance of trial counsel. In support, appellant stresses trial counsel's inexperience and references several places in the record where he allegedly erred. Appellant asserts that these errors are merely a highlight of "the most egregious mistakes."
Legal representation is constitutionally ineffective, and a basis for reversal or vacation of a conviction, when counsel's performance is deficient and results in prejudice to the accused. Strickland v. Washington (1984), 466 U.S. 668. In order to prove ineffective assistance of counsel, a defendant must show (1) that his counsel's performance fell below an objective standard of reasonable representation in some particular respect or respects and (2) that he was so prejudiced by the defect or defects that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, following Strickland.
In Ohio, a properly licensed attorney is presumed competent, and the burden is on the appellant to show counsel's ineffectiveness. State v. Lytle (1976), 48 Ohio St.2d 391, 397;State v. Hamblin (1988), 37 Ohio St.3d 153, 155-156. Debatable trial tactics generally do not constitute ineffectiveness. Statev. Phillips (1995), 74 Ohio St.3d 72, 85, citing State v. Clayton
(1980), 62 Ohio St.2d 45, 49.
Appellant first refers to the suppression hearing which was held immediately preceding trial. When asked about the reason for the motion, appellant's counsel stated: "The reasons for my motion to suppress is that my client has told me he doesn't know Antonio Cobbler." Appellant correctly avers that this alone is not a valid basis for a motion to suppress evidence. However, appellant's trial counsel goes on to elucidate that Cobbler was able to observe his client in the county jail despite a separation order and that the viewing was prejudicial to his client. The court found that the contact was unintentional and, therefore, denied the motion.
Appellant next argues that his trial counsel did not understand the rules of evidence when attempting to introduce the police reports of a couple of the robberies. Appellant further argues that the reports were not exculpatory. Upon review of this portion of the transcript, the court does agree that the reports were not necessarily exculpatory, however, they certainly were not damaging to appellant. The court does recognize that trial counsel was attempting to show that the victims' descriptions to police placed the perpetrators' heights as significantly taller than appellant.
Appellant also contends that his trial counsel was ineffective at cross examining witnesses. Appellant claims that the trial court lectured him on at least one occasion as to how to question. Appellant further claims that trial counsel was unable to contend with an "obstreperous" witness, and that he would often get flustered and not follow through with questioning. As to these arguments, we have carefully reviewed the referenced pages as well as the entire transcript. We cannot say that trial counsel's performance during cross-examination fell below an objective standard of reasonableness. Bradley, supra.
Appellant complains that his trial counsel accused a prosecution witness of blackmail. He claims that his counsel should have used a more "indirect" technique. Appellant further argues that trial counsel failed to properly present to the jury the details of the co-defendants' plea agreements. While trial counsel's technique may be debatable, it does not constitute a deprivation of effective counsel. State v. Phillips,74 Ohio St. 3d at 85.
Appellant argues that his trial counsel did not know what evidence was objectionable and that an objection he did make had no rational basis. Specifically, appellant complains that his trial counsel failed to object to the testimony of Cobbler, a co-defendant, who testified regarding threats allegedly made by appellant and directed to his girlfriend. While parts of his testimony may be considered hearsay, the fact that she pressed charges against appellant and had police escort her to work were arguably within Cobbler's personal knowledge. Further, even if counsel had objected, we find that no reasonable probability exists that the outcome of the trial would have been different. The court notes that throughout the course of the trial, appellant's counsel made several objections which were sustained. After a careful review of the entire trial transcript this court cannot say that appellant's trial counsel was ineffective as defined in Strickland, supra, and followed in Bradley, supra. Counsel's alleged errors, even when viewed cumulatively, do not give rise to a reasonable probability that but for the alleged errors the outcome of the trial would have been different when considering the overwhelming amount of evidence of appellant's guilt. Further, appellant's trial counsel repeatedly and consistently focused on the height of the robbers in an attempt to rule out his client's involvement. He also attempted to establish an alibi defense which, while proven ineffective, does not amount to a breach of counsel's duty to his client. Accordingly, appellant's assignment of error is not well-taken.
On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial, and the decision of the Lucas County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J.
 Melvin L. Resnick, J.
 Mark L. Pietrykowski, J.
CONCUR.
[1] A nolle prosequi was entered as to Count Eleven, aggravated robbery.